## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                               **No. 24-137**

**CHARLES RAY KEYS**                                **SECTION I**

### ORDER AND REASONS

Before the Court is defendant Charles Ray Keys's ("Keys") motion[1] to suppress evidence obtained pursuant to four search warrants. Keys primarily contests a search warrant issued for 4757 Tulip Street, New Orleans, LA ("the Tulip Street warrant").[2] However, he also contests three warrants issued subsequent to the search of 4757 Tulip Street.[3] The government filed a memorandum[4] in opposition to the motion.

On March 10, 2025, the Court held an evidentiary hearing with respect to the motion to suppress. Two witnesses testified at the hearing: New Orleans Police Department Detective Alden Moton ("Detective Moton") and FBI Agent Matthew Strickland ("Agent Strickland").[5] Keys and the government each submitted post-hearing briefs.[6] For the reasons set forth below, the Court denies the motion to suppress.

---

[1] R. Doc. No. 30.
[2] *See id*. at 5–8.
[3] *See id*. at 8–10.
[4] R. Doc. No. 33.
[5] R. Doc. No. 49.
[6] R. Doc. No. 52 (Keys's post-hearing brief); R. Doc. No. 53 (the government's post-hearing brief).

## I.    BACKGROUND

On April 17, 2024, the Orleans Parish Criminal District Court magistrate issued a warrant to search 4757 Tulip Street, New Orleans, LA.[7] Detective Moton submitted the affidavit in support of the Tulip Street warrant.[8] While the affidavit is signed and sworn to by Detective Moton, testimony at the evidentiary hearing revealed that, in reality, Agent Strickland was the one who prepared the affidavit and supplied the majority of the information contained therein.[9]

In the affidavit, Detective Moton included a photo of the residence at 4757 Tulip Street and stated that he believed that evidence of a violation of the law prohibiting possession with intent to distribute a schedule II controlled substance would be found inside.[10] Detective Moton stated that he became aware of an investigation involving a juvenile decedent who was found unresponsive at 4757 Tulip Street with heightened levels of fentanyl in his blood.[11] The affidavit states that the residence "belonged" to Keys and that Iris Meyers ("Meyers"), the mother of the decedent, sometimes resided at the residence because she was in a romantic relationship with Keys.[12]

Detective Moton then stated in the affidavit that he reviewed a lawfully recorded telephone conversation between two unnamed parties discussing the

---

[7] R. Doc. No. 30-3, at 5–6.
[8] *Id.* at 1–4.
[9] R. Doc. No. 52-1, at 9–10, 49–50.
[10] R. Doc. No. 30-3, at 1.
[11] *Id.* at 2.
[12] *Id.*

circumstances of the decedent's death.[13] During the hearing, Agent Strickland testified that he was able to discover this call because it was a jail call.[14] Specifically, the affidavit states that one of the individuals described how "a story developed" that the juvenile put his finger into some "dope" on a table and then put his finger in his mouth, leading to the juvenile's death.[15] The individuals also allegedly stated that the incident occurred in Keys's house and that the juvenile had access to firearms while in the presence of Meyers and Keys.[16]

Keys, the affidavit states, is prohibited from possessing firearms, as he is a convicted felon, and he has an "extensive criminal history" involving narcotics.[17] Detective Moton stated in the affidavit that he learned that Keys was on parole until 2035 for possession with intent to distribute cocaine as a habitual offender.[18] He also stated that he learned that Myers was a potential narcotics user with several documented police reports indicating potential substance abuse and/or mental illness.[19]

The affidavit proceeds to state how Detective Moton reviewed Keys's call records from the night that the decedent juvenile died, which allegedly showed many incoming and outgoing calls into the early hours of the morning.[20] Detective Moton

---

[13] *Id.*
[14] R. Doc. No. 52-1, at 57.
[15] R. Doc. No. 30-3, at 2.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

stated that this was inconsistent with the statement that Keys gave to the initial responding officer in which he had stated that he went to bed before the decedent at approximately 9:00 p.m.[21] The government has since informed the Court that this is a misstatement in the affidavit and that the call records, in fact, only show incoming calls for that night.[22]

Because of the call records, Detective Moton stated that he elected to surveil Keys at 4757 Tulip Street.[23] As a result of that surveillance, the affidavit represents that investigators observed vehicles park alongside the residence for short periods of time with occupants of the vehicles walking towards the residence and then leaving a short time later.[24] In conjunction with this vehicular activity, investigators allegedly observed Keys with a small bag draped around his neck as he went into and outside of the residence.[25] Detective Moton stated that the toxicology reports of the decedent, the call records, the vehicular activity around 4757 Tulip Street, and the criminal histories of Keys and Meyers[26] all led Detective Moton to believe that it was probable that evidence of narcotics use and sales would be present at the residence.[27]

---

[21] *Id.*
[22] *See* R. Doc. No. 48.
[23] R. Doc. No. 33-3, at 2.
[24] *Id.* at 3.
[25] *Id.*
[26] The affidavit states that Meyers was wanted for aggravated battery by cutting and that she had "several documented police reports indicating potential substance abuse and/or mental illness." *Id.* at 2.
[27] *Id.* at 3.

4

On April 17, 2024, Magistrate Jonathan Friedman of the Orleans Parish Criminal District Court issued a warrant to search 4757 Tulip Street based on this affidavit.[28] Officers searched 4757 Tulip Street at approximately 9:30 a.m. on April 18, 2024.[29] Three subsequent affidavits in support of three search warrants in this case, each sworn to on April 23, 2024, state that the April 18, 2024 search of 4757 Tulip Street resulted in finding both Keys and Meyers inside the residence along with certain evidence.[30] These affidavits state that the evidence found included approximately 291.3 grams of crack cocaine, 29.8 grams of fentanyl, 20.4 grams of cocaine, 22.5 grams of marijuana, 3 handguns, 1 shotgun, 1 rifle, $2277 in cash, a Motorola cellphone, and other items of evidentiary value.[31] Keys and Meyers were then placed under arrest.[32]

Keys was indicted on June 14, 2024.[33] Count one charges Keys with possession with intent to distribute cocaine and fentanyl pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[34] Count two charges Keys with possession of a firearm in furtherance of a drug trafficking crime pursuant to 18 U.S.C. § 924(c)(1)(A)(i).[35] Count three charges

---

[28] *Id.* at 5–6.
[29] R. Doc. No. 30-4, at 4, 14, 20.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] R. Doc. No. 1.
[34] *Id.* at 1.
[35] *Id.* at 2.

Keys with possession of a firearm and ammunition as a convicted felon pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(8).[36]

Keys then filed a motion to suppress, arguing that the narcotics, firearms, and other evidence seized pursuant to the Tulip Street warrant were obtained in violation of the Fourth Amendment.[37] Keys alleges that the search warrant contained several defects and that the evidence seized should be suppressed.[38] Keys also argues that evidence seized pursuant to the three subsequent warrants should also be suppressed because of alleged inconsistencies in the affidavits and because those warrants rely, in part, on the same probable cause statement used to obtain the Tulip Street warrant.[39]

In response, the government argues that the good-faith exception to the exclusionary rule announced in *United States v. Leon*[40] should apply.[41] The government also argues that the affidavit upon which the magistrate relied when issuing the Tulip Street warrant contained sufficient facts for the magistrate to reasonably conclude that evidence of a crime of possession with intent to distribute narcotics would be found inside the residence.[42]

---

[36] *Id.* at 2–3.
[37] R. Doc. No. 30-1, at 1.
[38] *Id.* at 3.
[39] *Id.* at 8–10.
[40] 468 U.S. 897 (1984).
[41] R. Doc. No. 33, at 1.
[42] *Id.*

## II.    STANDARD OF LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The U.S. Supreme Court's Fourth Amendment jurisprudence has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.* A party urging a motion to suppress evidence "has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [their] Fourth Amendment rights." *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)).

The good-faith exception states that the exclusionary rule does not apply when an officer obtains evidence in "objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. This good-faith exception exists because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. "In sum, when an officer executes a warrant in good faith, the deterrent effect of the exclusionary rule on that officer does not trump the costs of suppressing reliable physical evidence, even if the search is subsequently found violative of the Fourth Amendment." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005).

However, because reliance on a warrant must be objectively reasonable, the good-faith exception does not apply in the following circumstances:

7

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Woerner*, 709 F.3d 527, 533–34 (5th Cir. 2013) (citing *Leon*, 468 U.S. at 921–25). A court "need not reach the probable cause issue if the good-faith exception applies, and the case does not involve a 'novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates.'" *United States. v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring)).

## III.    ANALYSIS

When asked for clarification ahead of the evidentiary hearing, Keys's counsel informed the Court that his request that the Court apply the exclusionary rule despite the existence of a warrant was based only on the allegedly misleading information in the various affidavits.[43] At that time, Keys stated that he did not intend to challenge the warrants at issue on any other basis not covered by the good-faith exception.[44] However, in his post-hearing brief, Keys argues that the evidentiary hearing revealed additional grounds to challenge the warrants, namely that the magistrate abandoned his judicial role and that the warrants are so lacking in indicia

---

[43] R. Doc. No. 48, at 2.
[44] *Id.*

of probable cause such that belief in its existence is entirely unreasonable.[45] The Court therefore addresses each ground in turn.

### a. Misleading Statements in the Affidavit

To apply the exclusionary rule based on false statements in an affidavit, the defendant must establish by a preponderance of the evidence that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the warrant affidavit. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). In this analysis, omissions are treated essentially the same as misstatements. *See United States v. Arispe*, 328 F. App'x 905, 907 (5th Cir. 2009).

If the defendant demonstrates that the affiant made such a statement, the court must disregard the false statements. *Franks*, 438 U.S. at 156. If, after the false material is excluded from the affidavit, the remaining content is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* In other words, the *Franks* analysis requires that the misstatements be material to a finding of probable cause. *See Kohler v. Englade*, 470 F.3d 1104, 1113–14 (5th Cir. 2006).

### i. Description of 4757 Tulip Street

As the first alleged error with the Tulip Street warrant, Keys's motion to suppress argues that the affidavit improperly described the residence, including a

---

[45] R. Doc. No. 52, at 11.

statement that the residence "belonged" to Keys.[46] In fact, the motion argues, 4757 Tulip Street is owned by Kenneth Haines.[47] Keys attaches records from the Orleans Land Records Division in support of this argument.[48] Keys also argues that the photo of 4757 Tulip Street submitted in the warrant affidavit presented an inaccurate picture of the condition of the residence.[49] He argues that the photo in the affidavit presented an "intact, clean, and finished residence owned by Keys" but that, in reality, "the residence was in disrepair," "open to anyone from the public to access," and "was not owned by Keys."[50]

From this, Keys argues that the warrant failed to properly identify the residence and to narrow the discretion of investigating officers.[51] Keys cites several cases in support in which courts have invalidated warrants for failing to describe a property to be searched with particularity.[52]

In response, the government argues that any misstatement that the property belonged to Keys was not material because the investigation and the warrant both made clear that Keys resided at the property.[53] The government states that Keys reported to police that he fell asleep at the property when the juvenile was found

---

[46] R. Doc. No. 30-1, at 5.

[47] *Id.*

[48] *See* R. Doc. No. 30-5, at 1.

[49] R. Doc. No. 30-1, at 6.

[50] *Id.*

[51] *Id.* at 5.

[52] *Id.*

[53] R. Doc. No. 33, at 5.

unresponsive and that further surveillance of the property revealed that Keys would enter and exit the home freely.[54]

The government also points to the written description of the property in the warrant affidavit.[55] In it, Detective Moton describes the residence as "in disrepair with a tarped back fence area" and with part of the brick wall missing along the side of the house.[56] The affidavit further notes that the residence was under renovation and that the room where the juvenile decedent was found was "cold, with no electricity, or heat."[57]

At the evidentiary hearing, Detective Moton testified that he did not supply the picture of the property that appeared in the affidavit.[58] Detective Moton told the Court that he learned that the residence belonged to Keys from Agent Strickland, but he did not do any independent research with respect to the ownership of the property.[59] He also stated that Detective Raney, a child abuse detective employed with the New Orleans Police Department, informed him that Keys was living in the residence at the time of the decedent's death.[60] Detective Moton stated that his understanding was that Keys resided at 4757 Tulip Street.[61] He further testified that,

---

[54] *Id.* at 5–6.
[55] *Id.* at 6.
[56] R. Doc. No. 30-3, at 3.
[57] *Id.*
[58] R. Doc. No. 52-1, at 9.
[59] *Id.* at 11.
[60] *Id.* at 13, 41.
[61] *Id.* at 15.

at the time he applied for the warrant, he was unaware of any misstatements that he was making to the Court.[62]

Agent Strickland testified that he got the image of 4757 Tulip Street in the warrant affidavit from Google Images or Google Earth and that, other than a new coat of paint and the residence being in a bit more disrepair, the picture accurately depicted the residence.[63] He stated that he assumed that Keys was the owner and occupant of the property.[64] As a basis for this, Agent Strickland testified that he observed Keys at the residence nearly every day during the 17 days that he conducted surveillance and that Keys would enter the residence at night without exiting until the next morning.[65] Agent Strickland also pointed to the fact that one of the participants in the recorded phone call referred to the place where the decedent died as "Ray Keys house."[66] However, he conceded that he never researched the owner of the property and that using the word "belonged" was a mistake.[67]

While the affidavit falsely stated that 4757 Tulip Street "belonged" to Keys, the Court cannot conclude that either Detective Moton or Agent Strickland made this false statement intentionally or in reckless disregard of its truth. Both officers credibly testified that they believed that Keys was the owner and occupant of the

---

[62] *Id.* at 45.
[63] *Id.* at 47–48.
[64] *Id.* at 48, 103.
[65] *Id.* at 56–57.
[66] *Id.* at 58; *see also* R. Doc. No. 51-6, at 3.
[67] R. Doc. No. 52-1, at 48–49.

residence. This assumption was supported by observations during surveillance and statements that Agent Strickland heard on the recorded call.

The Court likewise cannot conclude that either Agent Strickland or Detective Moton misrepresented the state of the property or otherwise failed to describe the nature of the property with sufficient particularity. While Strickland acknowledged that the property was in a bit more disrepair than the image in the affidavit depicted, he testified that the photo accurately depicted the property. Additionally, the written description of the property in the affidavit described the property as being in a bit of disrepair.

*ii.    Reliability of the Inmate*

Regarding the warrant affidavit's description of the recorded call in which two individuals discussed the circumstances of the juvenile's death, Keys argues that the affidavit was deficient because it failed to disclose one callers' status as an inmate.[68] This omission, Keys contends, deprived the reviewing magistrate of sufficient information to determine the reliability of the caller and constitutes a material omission.[69]

In response, the government argues that the phone call was not one in which an individual was providing information to law enforcement such that the magistrate would need to evaluate the speaker's potential bias as an inmate.[70] Instead, the

---

[68] R. Doc. No. 30-1, at 6.

[69] *Id.*

[70] R. Doc. No. 33, at 6.

government states that this was a call which was located by law enforcement after the fact and that the speakers likely had no reason to believe that their phone call would later be relevant in a search warrant application.[71]

Agent Strickland testified at the evidentiary hearing that he was the one to locate the call mentioned in the affidavit and that it was a jail call.[72] Detective Moton testified that he never listened to this call, nor did he review a transcript of the call.[73] Instead, he learned about the contents of the call by speaking to Agent Strickland.[74]

During the hearing, Agent Strickland stated that the phone call in question was between an unidentified female and an unidentified male.[75] Agent Strickland stated that the male, who was incarcerated, was known to him.[76] However, he admitted that he had no idea how the participants in the call received information regarding the cause of the decedent's death.[77] Despite this, Agent Strickland stated that he believed that the call was reliable because of certain verified information relayed during the call, such as the fact of the child's death, the location of the death, and the fact that the child had died from fentanyl according to the preliminary toxicology report.[78] Additionally, the person who provided this information on the call

---

[71] *Id.*
[72] R. Doc. No. 52-1, at 57.
[73] *Id.* at 17–18.
[74] *Id.*
[75] *Id.* at 60.
[76] *Id.*
[77] *Id.* at 58.
[78] *Id.* at 101–02.

was not the jailed individual.[79] When asked why he did not provide much of this information in the affidavit, Agent Strickland stated that he wanted to protect the call as an investigative tool, and he knew that warrants are often public records.[80]

Based on the information presented at the hearing, the Court cannot conclude that Agent Strickland or Detective Moton mislead the magistrate judge. Because the speaker who gave the information was not incarcerated, and because the statements were not made to law enforcement, there was no reason to believe that the callers' location at a jail undermined the credibility of the information. Additionally, while Agent Strickland had no information regarding how the participants on the call received their information and whether it was reliable, he did not overstate the reliability of that call. The affidavit specifically stated that, during the phone call, "a story developed" regarding the circumstances of the decedents' death,[81] indicating that the information on the call may have been speculation.

### iii.    Detective Moton's Firsthand Knowledge

Keys's third argument for why the Tulip Street warrant was deficient is that the affiant, Detective Moton, did not rely on firsthand evidence.[82] In particular, Keys points out that Detective Moton was not the investigator on the decedent juvenile's death and that he did not participate in the surveillance of 4757 Tulip Street.[83] Keys

---

[79] *Id.* at 102.
[80] *Id.* at 60.
[81] *See* R. Doc. No. 30-3, at 2.
[82] R. Doc. No. 30-1, at 7–8.
[83] *Id.*

thereby argues that all the information provided in the affidavit for the Tulip Street warrant is secondhand and, therefore, inherently unreliable.[84]

As the government points out in its response,[85] the Fifth Circuit "has long recognized that an officer submitting a warrant application need not have firsthand knowledge of all the facts underlying the application." *Miller v. Salvaggio* No. 23-50894, 2024 WL 5116799, at *5 (5th Cir. 2024). However, if an officer falsely states his involvement when he did not personally experience the event, the court must determine whether the false statement was made intentionally or with reckless disregard for its truth. *See United States v. Ortega*, 854 F.3d 818, 827 (5th Cir. 2017) (concluding that an officer's statement that a confidential informant had provided him with credible information in the past was false pursuant to *Franks* because the confidential informant had only provided information to other officers previously, then analyzing whether the false statement was made with the requisite intent).

Detective Moton testified that Agent Strickland contacted him in March 2024, advising him that an overdose death had occurred at 4757 Tulip Street and asking him to author the Tulip Street warrant.[86] He stated that Agent Strickland was the one to supply the contents of the affidavit and that he had nothing to do with its preparation.[87] Agent Strickland stated that he and Detective Moton had drafted the affidavit together, but he admitted that it was fair to say that he had supplied the

---

[84] *Id.* at 8.
[85] R. Doc. No. 33, at 6–7.
[86] R. Doc. No. 52-1, at 5–6.
[87] *Id.* at 9–10.

vast majority of the information.[88] Still, Strickland maintained that Moton was with him during many of the instances where he gathered information.[89] Agent Strickland was likewise the one to prepare the three warrant affidavits that came after the Tulip Street warrant.[90] However, Detective Moton confirmed that he did read each of the affidavits before signing them.[91]

In the initial stages of the investigation, Detective Moton stated that he did not independently investigate Keys's criminal history and that he proceeded based on Agent Strickland's representations regarding the same.[92] Agent Strickland likewise was the one to inform him that Meyers was a potential narcotics user.[93] However, Detective Moton testified that he personally reviewed the toxicology report mentioned in the affidavit.[94]

According to Detective Moton, Agent Strickland was the one to locate the recorded telephone conversation.[95] Detective Moton, in fact, did not listen to or review a transcript of the call.[96] Instead, he only spoke to Agent Strickland about the contents of the call.[97] Detective Moton also testified that, contrary to his affidavit, he did not review any of Keys's phone records and he was not the one to develop a phone

---

[88] *Id.* at 49–50.
[89] *Id.* at 52.
[90] *Id.* at 25–26.
[91] *Id.* at 10, 25–26.
[92] *Id.* at 8.
[93] *Id.* at 19–20.
[94] *Id.* at 16.
[95] *Id.* at 17–18.
[96] *Id.*
[97] *Id.* at 18–19.

number for Keys or request those phone records.[98] Agent Strickland confirmed that he was the one who located the recorded jail call[99] and the one who developed phone records for the phone number that Keys provided to police.[100]

Regarding the surveillance on 4757 Tulip Street, Detective Moton testified that the pole cameras used to surveil the residence were initiated at Agent Strickland's instigation[101] rather than his own initiative as indicated in the affidavit. Detective Moton testified that he did not personally review any of the surveillance from the pole camera.[102] He also stated that he did not personally conduct any in-person surveillance on the property other than on the morning of the warrant's execution and on one other occasion, neither of which are described in any of the affidavits.[103]

When asked why Detective Moton supplied the affidavit for the Tulip Street warrant instead of Agent Strickland, Detective Moton stated that his understanding was that agencies typically have an officer with jurisdiction over the case sign the warrant affidavit.[104] Agent Strickland likewise testified that he wrote the affidavit from the perspective of Detective Moton and had him sign it because the application was before a state court, and Detective Moton was a state officer.[105] Agent Strickland stated that, as a federal officer, he would not be able to swear out a warrant to a state

---

[98] *Id.* at 22–23.
[99] *Id.* at 57.
[100] *Id.* at 69, 72–75.
[101] *Id.* at 7.
[102] *Id.*
[103] *Id.* at 31–35.
[104] *Id.* at 22–23.
[105] *Id.* at 51, 101.

commissioner.[106] Though he was unaware of any specific law that provided he could not do so, Agent Strickland stated that he had never sworn out a warrant to a state commissioner and that he had never heard of a federal officer doing so.[107]

Much of the information in the affidavit, while learned secondhand, does not falsely suggest Detective Moton's involvement in procuring the information. Several statements in the affidavit use language such as Detective Moton "learned that," Detective Moton "became aware," or "Investigators have observed."[108] This includes statements regarding the investigation over the decedent's death, the status of the property as belonging to Keys, and descriptions of what was observed during surveillance.[109] Because information in the affidavit need not be firsthand, the affidavit is not defective merely because Detective Moton learned this information from Agent Strickland rather than through independent investigation.

Several other statements in the affidavit, however, falsely state Detective Moton's direct involvement in certain investigative steps. The affidavit falsely states that Detective Moton was the one who located the recorded jail phone call.[110] It also falsely states that Detective Moton reviewed the criminal histories of Keys and Meyers, developed a phone number for Keys, reviewed his phone records, and that he was the one who elected to surveil 4757 Tulip Street.[111]

---

[106] *Id.* at 53.
[107] *Id.* at 53–54.
[108] *See* R. Doc. No. 30-3, at 2–3.
[109] *See id.*
[110] *See id.* at 2.
[111] *See id.*

19

However, the Court concludes that these false statements were not made with intent to mislead or with reckless disregard to any misleading effect. Instead, Detective Moton's and Agent Stricklands' misstatements were the result of a questionable belief that the warrant affidavit must be written from the point of view of a state officer. In concluding that Agent Strickland and Detective Moton lacked the requisite intent, the Court notes that there was no apparent motive to lie since Detective Moton would be permitted to swear his affidavit while relying entirely on information acquired by Agent Strickland.

<em>iv.    Facts Since Proven To Be Unreliable</em>

Keys next argues that Detective Moton provided facts in the affidavit which have proven to be unreliable.[112] First, Keys argues that videos produced in discovery reveal that the vehicular activity and movements of Keys observed in surveillance footage—which Detective Moton described as most likely indicating illegal narcotics sales—shows only construction work.[113] Keys also argues that Detective Moton omitted information in his affidavit that the New Orleans Police Department obtained and executed a warrant on 4757 Tulip Street on January 13, 2024, shortly after the juvenile was pronounced deceased.[114] That search, Keys states, uncovered no contraband.[115]

---

[112] R. Doc. No. 30-1, at 8.
[113] *Id.*
[114] *Id.*
[115] *Id.*

Lastly, in his post-hearing briefing, Keys points out that the phone records—which allegedly showed both incoming and outgoing calls on the night that the decedent died—in reality showed no outgoing calls.[116] This, Keys argues, formed the basis for Agent Strickland's belief that there was time to clean the residence of any evidence before the search that occurred when officers responded to the decedent's death.[117] Keys thereby contends that Agent Strickland made a material misstatement.

The government argues in response that Keys's disagreement with what the surveillance video shows is the type of cursory attack not allowed by *Franks*.[118] In addition, the government points out that the affidavit did, in fact, mention the search of 4757 Tulip Street occurring subsequent to the discovery of the juvenile decedent.[119] In its post-hearing brief, the government acknowledges that the description in the affidavit of Keys's phone records showing both incoming and outgoing calls has since been found to be incorrect.[120] However, the government argues that Agent Strickland has adequately explained that he had a good-faith belief in the truth of his statements at the time that he drafted the affidavit and that he gave a reasonable explanation for his error.[121]

---

[116] R. Doc. No. 52, at 5.

[117] *Id.*

[118] R. Doc. No. 33, at 7.

[119] *Id.*; *see also* R. Doc. No. 30-3, at 2.

[120] R. Doc. No. 53, at 3.

[121] *Id.*

21

Contrary to Keys's suggestion, the affidavit did mention the search of 4757 Tulip Street that occurred after the juvenile decedent was discovered.[122] While the affidavit did not specifically state that the search did not uncover any contraband, this is implied by the affidavit's statement that there would have been time to clean the residence.[123] Indeed, Agent Strickland testified that he would have included information regarding any contraband that was found if he was aware of it.[124] The Court therefore concludes that Detective Moton did not omit the fact that 4757 Tulip Street had already been searched after the decedent's death or omit relevant information regarding what was found.

Following Agent Strickland's testimony and having observed footage during the evidentiary hearing, it is clear that Keys's argument regarding what the surveillance shows does not contest any facts in the affidavit and merely contests its conclusions. Agent Strickland testified at the evidentiary hearing regarding the vehicular activity that he observed near the residence and his interpretation of why he believed that the surveillance footage showed narcotics activity.[125] Keys does not contest the facts alleged, such as whether individuals frequently visited the residence for short periods of time or whether Keys had a small bag around his neck when he entered and exited the residence. Rather, Keys only disputes whether it was

---

[122] *See* R. Doc. No. 30-3, at 2.
[123] *See id.*
[124] R. Doc. No. 52-1, at 70.
[125] *Id.* at 87–89.

appropriate for the affidavit to draw its conclusion that the facts alleged showed narcotics activity.

Even assuming that the omission of information regarding ongoing construction at the property was a material omission, the Court cannot conclude that Agent Strickland or Detective Moton intended to mislead the magistrate. Agent Strickland testified that the construction activity appeared to be minor and that he did not believe that it was relevant information.[126] Detective Moton, in describing what he observed at the residence on the morning that the warrant was executed, likewise testified that he observed what appeared to be four or five narcotics transactions.[127] He testified that he observed no construction activity and that all of the vehicles that approached the residence were regular vehicles.[128] Because Keys cannot point to a misstatement regarding surveillance activity in the affidavit and cannot show that any omission was made with the intent to mislead, Keys fails his burden pursuant to *Franks* with respect to this argument.

Lastly, with respect to the false statement that Keys's phone records showed both incoming and outgoing calls on the night of the decedent's death, Agent Strickland testified that he initially obtained phone records for the cell phone number that Keys provided officers and reviewed them personally.[129] This initial request

---

[126] *Id.* at 55–56.
[127] *Id.* at 24.
[128] *Id.* at 29.
[129] *Id.* at 73.

23

looked at records from January through March.[130] Focusing on the records that occurred after 9:00 p.m. on January 12, Agent Strickland stated that he believed that he observed both incoming and outgoing calls on that night.[131] He believed that this was inconsistent with what Keys told police[132] as he detailed in the affidavit.

After the search of 4757 Tulip Street, Agent Strickland obtained a warrant for additional cell phone records from the same phone for January 12 through 14.[133] He stated that the reason for this second request was because he wanted additional details and cell-site information.[134] After examining this second set of records, Agent Strickland stated that he realized that he had been operating under a misunderstanding.[135]

Because the second set of records included a key to interpret the phone records, Agent Strickland testified that he consulted with a Cellular Analysis Survey Team (CAST) expert.[136] Through this consultation, Agent Strickland learned that certain calls labeled as outgoing calls were actually incoming calls going to voicemail or call forwarding.[137] There had in fact been no outgoing calls from Keys's phone on the night of the decedent's death.[138] Agent Strickland stated that, although his belief had been

---

[130] *Id.*
[131] *Id.* at 74.
[132] *Id.*
[133] *Id.* at 74–75.
[134] *Id.* at 75.
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.*

in error, he believed that the phone records reflected outgoing calls at the time he drafted the affidavit.[139]

While representations regarding Keys's phone records in the affidavit were undisputedly false, the Court concludes that this false statement was made unintentionally. Keys's argument that Agent Strickland should have consulted with a CAST expert earlier[140] may suggest negligence, but it fails to establish reckless disregard or intent to mislead. Agent Strickland's false statement here is plainly the kind of good-faith mistake permitted by *Leon*.

      *v.*    *Subsequent Warrants and Accuracy of Evidence Seized*

Lastly, Keys argues that evidence seized based on three additional warrants— issued after the Tulip Street warrant—should also be suppressed because of deficiencies in the warrant affidavits.[141] These warrants are for a Motorola cell phone,[142] Keys's DNA,[143] and phone records connected to Keys's cell phone number.[144] Keys contends that the affidavits in support of these warrants copy and paste the facts alleged in the Tulip Street warrant, along with its allegedly misleading statements, and supplement the affidavits with additional information related to the execution of that warrant.[145]

---

[139] *Id.* at 84–85, 102–03.
[140] *See* R. Doc. No. 52, at 5; R. Doc. No. 52-1, at 75–76.
[141] R. Doc. No. 30-1, at 8–10.
[142] R. Doc. No. 30-4, at 1–10.
[143] *Id.* at 11–17.
[144] *Id.* at 18–29.
[145] R. Doc. No. 30-1, at 8–9.

Keys also argues that there are inconsistencies between the FBI report and the remaining warrant affidavits regarding the April 18, 2024 search of 4757 Tulip Street.[146] Keys states that the subsequent warrants and the FBI report list different quantities of narcotics allegedly seized during the search of 4757 Tulip Street.[147] He also states that the FBI report described finding cocaine and firearms in the area where they saw Keys near the bed when he was ordered out of the bedroom.[148] Yet Keys argues that photographs produced in discovery contradicted the assertions that the contraband was found near a bed.[149] These inconsistencies, Keys argues, "could be probative of tampered or commingled evidence," and he thereby argues that evidence seized as a result of the warrants that relied on these drug quantities should be suppressed.[150]

The government contests these alleged inaccuracies. In regard to the narcotics quantities, the government points out that the warrant affidavits refer to the narcotics quantities as approximations.[151] Even if the quantities were inaccurate, the government argues that these inaccuracies would not be material such that it would invalidate the warrant.[152] In response to the alleged discrepancies between the FBI report and photographs of where contraband was found, the government argues that

---

[146] *Id.* at 9.
[147] *Id.* at 9–10.
[148] *Id.* at 9.
[149] *Id.*
[150] *Id.* at 9–10.
[151] R. Doc. No. 33, at 7–8; *see also* R. Doc No. 30-4, at 4.
[152] R. Doc. No. 33, at 7–8.

the photographs indeed show that narcotics were discovered near a bed frame and mattress.[153]

With respect to the drug quantities as listed in the affidavits and the FBI report, Agent Strickland testified that the quantities of contraband listed in the various documents are approximate.[154] When asked to explain the discrepancies between the documents, Agent Strickland explained that the weights in the affidavit probably would have been an on-sight preliminary weight taken at the scene, as the evidence was found at the residence.[155] These weights would likely include the packaging that was included when the items were found.[156] The weights in the FBI report, however, would have been total package weights that would have included additional packaging from FBI office used to store the contraband.[157] Nonetheless, both the weights in the affidavits and the weights in the FBI report are considered preliminary before the official weight in the LSP chemical analysis report.[158]

The Court finds that the affidavits did not include any false statements regarding the weights of the contraband found at 4757 Tulip Street. Each of the affidavits described the weights as approximations. Furthermore, Agent Strickland explained that the methods for how weights are calculated varies slightly between weights taken on-sight and weights taken at the FBI office.

---

[153] *Id.* at 7.
[154] R. Doc. No. 52-1, at 97.
[155] *Id.* at 98–99.
[156] *Id.* at 98.
[157] *Id.*
[158] *Id.* at 98–99.

The Court concludes that the statement regarding where the contraband was found is not a basis for applying the exclusionary rule. In particular, the challenged statement appears in an April 22, 2024 FBI report.[159] It does not appear in any of the warrant affidavits and so was not relied upon in issuing any of the warrants at issue. Furthermore, even if this statement had appeared in a warrant affidavit, the Court cannot conclude that it amounts to a misleading characterization of what was found. The photographs on which Keys relies, which were allegedly taken upon execution of the warrant, appear to show a firearm and a bag partially under a mattress and bed frame.[160] Another photograph shows what appear to be narcotics in the bag that was near the bed.[161] Even if Keys contests the characterization in the FBI report of these items being "near" a bed, the characterizations are subjective and are not an unfair representation of what the photographs show.

### b. Magistrate Wholly Abandoned His Judicial Role

The good-faith exception also does not apply in cases where the issuing magistrate wholly abandoned his judicial role "in the manner condemned in *Lo–Ji Sales, Inc. v. New York*." *Leon*, 468 U.S. at 923 (citing *Lo–Ji Sales, Inc.*, 442 U.S. 319 (1979)). In *Lo–Ji Sales*, the judge "did not manifest that neutrality and detachment demanded of a judicial officer" and instead acted as an "adjunct law enforcement officer" when he participated in the execution of the search warrant and helped

---

[159] *See* R. Doc. No. 30-2, at 1.
[160] *See* R. Doc. No. 30-11, at 1.
[161] *See id.* at 3.

determine whether items not listed in the warrant should be seized. *See Lo–Ji Sales, Inc.*, 442 U.S. at 321–22, 326–27. "A magistrate failing to 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and who acts instead as 'an adjunct law enforcement officer' cannot provide valid authorization for an otherwise unconstitutional search." *Leon*, 468 U.S. at 914 (quoting *Lo–Ji Sales, Inc.*, 442 U.S. at 326–27).

A judge may also wholly abandon his judicial role when the judge "serve[s] merely as a rubber stamp for the police." *Leon*, 468 U.S. at 914 (quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). However, the Fifth Circuit has instructed that the good-faith exception should still apply, even when the magistrate judge did not fully perform his role, "so long as the judge 'appeared to [the officers] to have fulfilled his duty to act as a neutral and detached magistrate.'" *United States v. Gonzalez*, 766 F. App'x 178, 181 (5th Cir. 2019) (alteration in original) (quoting *United States v. Breckenridge*, 782 F.2d 1317, 1321–22 (5th Cir. 1986)).

In his post-hearing brief, Keys argues that this exception to *Leon* warrants application of the exclusionary rule in this matter.[162] As a basis for this, Keys argues that neither Agent Strickland nor Detective Moton gave any "oral grounds or clarifications" to the judges with respect to their warrant affidavits.[163] Instead, Keys argues that all of the affidavits were "electronically submitted and rubber stamped

---

[162] R. Doc. No. 52, at 11.
[163] *Id.*; *see also* R. Doc. No. 52-1, at 36.

without supplement or clarification."[164] Keys argues that this lack of clarification coupled with other deficiencies in the affidavits lead to the conclusion that the judges abandoned their judicial role.[165]

Keys provides no evidence, other than the alleged deficiencies in the affidavits, to conclude that the judges who issued warrants based on these affidavits abandoned their judicial role. The fact that a judge does not ask for oral clarification from an officer does not establish that a judge acted as a mere rubber stamp for police or acted as an adjunct law enforcement officer. Furthermore, Keys has presented no evidence indicating that the judges here would have appeared to the officers to have abandoned their roles as neutral and detached magistrates.

### c. Bare Bones Affidavit

The last basis applicable to this matter—the so-called bare-bones-affidavit exception—allows the court to apply the exclusionary rule despite the existence of a warrant "when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *See Woerner*, 709 F.3d at 534. In general, "[a]n officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a bare bones affidavit." *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997) (quoting *United States v. Alix*, 86 F.3d 429, 435 (5th Cir. 1996)). Here, "the question is not whether the affidavit ultimately supported probable cause, but whether the officer applying for the warrant was 'entirely

---

[164] R. Doc. No. 52, at 11.
[165] *Id.*

unreasonable' in believing that the affidavit supported probable cause." *Gonzales*, 766 F. App'x at 182 (quoting *Leon*, 468 U.S. at 923).

Bare bones affidavits "do not detail any facts, they allege only conclusions." *United States v. Morton*, 46 F.4th 331, 337 (5th Cir. 2022). These bare bones affidavits "lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *Satterwhite*, 980 F.2d at 321. In determining whether there is sufficient factual information in the affidavit, judges may "draw reasonable, common-sense inferences from the affidavit." *See United States v. Norman*, 129 F.4th 874, 877 (5th Cir. 2025). "Whether an affidavit is a bare bones affidavit is determined by a totality of the circumstances." *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014).

Keys argues that the warrants here were based on affidavits so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable.[166] In support, Keys states that Agent Strickland, who executed the warrants, could not have reasonably believed that there was probable cause because he was the one who supplied the allegedly misleading information and authored the allegedly misleading affidavits.[167]

The Court has already determined that the *Franks* analysis does not justify applying the exclusionary rule as a result of any allegedly false or misleading statements from the affidavits. The Court determined that each of the allegedly

---

[166] *Id.*
[167] *Id.*

misleading statements that Keys challenges were either not misleading or were not made with the requisite intent. Additionally, Agent Strickland's subjective belief regarding whether the affidavits supported a finding of probable cause is not the relevant inquiry when determining whether the good-faith exception applies. Instead, the relevant inquiry is whether reliance on the warrants based on the affidavits was objectively reasonable. *See Leon*, 468 U.S. at 923 ("Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (internal quotation omitted)).

Looking at whether the affidavits here are so bare bones that reliance on them was objectively unreasonable, the Court notes several ways in which the affidavit in support of the Tulip Street warrant, which information was included in the other warrant affidavits, carelessly omits relevant information or lacks the desired level of clarity. While somewhat implied by Keys's statements to responding officers that he went to sleep before the decedent and statements of ownership now determined to be incorrect, nothing in the affidavit explicitly states that Keys was residing at 4757 Tulip Street. Regarding the recorded phone call, the affidavit does not state how the individuals on the call might have gotten their information or give any information supporting the speakers' credibility. It did not specify the dates on which surveillance of 4757 Tulip Street took place. Nor did it state any reasons in support of its conclusion that the bag that investigators observed draped around Keys's neck was used to store narcotics. The Court also notes that it is unclear how much time passed

32

between the death of the decedent and the initial search of the property and whether it supports the conclusion that there would have been time to clean the property.

However, despite this lack of attention to detail, the Court cannot conclude that the executing officers were entirely unreasonable in believing that there was probable cause to search 4757 Tulip Street. Detective Moton's four-page affidavit includes more than bare legal conclusions and sets out facts connecting the evidence to be seized with the place to be searched. This included descriptions of vehicular and pedestrian activity at the residence indicating potential narcotics activity. It likewise included the toxicology report indicating that the decedent, who died at the residence, died of fentanyl. And it included descriptions of Keys's criminal history, including other narcotics violations. The affidavit thereby contained sufficient factual detail such that Detective Moton and Agent Strickland were entitled to rely on the magistrate's independent determination of probable cause.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion to suppress is **DENIED.**

New Orleans, Louisiana, April 7, 2025.


LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**

33